## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROBERT FEINSTEIN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> BONANZA CREEK ENERGY, INC., JACK E. VAUGHN, PAUL KEGLEVIC, BRIAN STECK, THOMAS B. TYREE, JR., SCOTT D. VOGEL, and JEFFREY E. WOJAHN, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Robert Feinstein ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Bonanza Creek Energy, Inc. ("Bonanza Creek" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Bonanza, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100 in connection with the proposed merger (the "Proposed Merger") between Bonanza Creek and a subsidiary of SandRidge Energy, Inc. ("SandRidge").

2.      On November 14, 2017, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand

to receive $36.00 in cash and stock for each share of Bonanza Creek stock they own (the "Merger Consideration"), a deal valued at $746 million.[1]

3.      On December 11, 2017, in order to convince Bonanza Creek shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement (the "S-4") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.  The materially incomplete and misleading S-4 independently violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. 240.14a-9), each of which constitutes a violation of Section 14(a) and 20(a) of the Exchange Act.

4.      While touting the fairness of the Merger Consideration to the Company's shareholders in the S-4, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby violating SEC rules and regulations and rendering certain statements in the S-4 materially incomplete and misleading.

5.      In particular, the S-4 contains materially incomplete and misleading information concerning the financial forecasts for the Company and SandRidge that were both prepared and relied upon by the Board in recommending the Company's shareholders vote in favor of the Proposed Merger.  The financial forecasts were also utilized by Bonanza Creek's financial advisor, Evercore Group L.L.C. ("Evercore"), in conducting the valuation analyses in support of its fairness opinion.

---

[1]      Cara Lombardo, *SandRidge Energy Confirms $746 Million Deal to Buy Bonanza Creek,* The Wall Street Journal, Nov. 15, 2017, https://www.wsj.com/articles/sandridge-energy-confirms-746-million-deal-to-buy-bonanza-creek-1510750492.

6.      It is imperative that the material information that has been omitted from the S-4 is disclosed prior to the forthcoming stockholder vote in order to allow the Company's stockholders to make an informed decision regarding the Proposed Merger.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of (i) Regulation G (17 C.F.R. § 244.100) and (ii) Rule 14a-9 (17 C.F.R. 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the stockholders vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless, and until, the material information discussed below is disclosed to Bonanza Creek shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Bonanza Creek is incorporated in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of Bonanza Creek common stock.

12.     Defendant Bonanza Creek is incorporated in Delaware and maintains its principal executive offices at 410 17th Street, Suite 1400, Denver, Colorado 80202.   The Company's common stock trades on the New York Stock Exchange under the ticker symbol "BCEI".

13.     Individual Defendant Jack E. Vaughn has served as Chairman of the Company's Board of Directors since April 2017.

14.     Individual Defendant Paul Keglevic has served as a director of the Company since April 2017.

15.     Individual Defendant Brian Steck has served as a director of the Company since April 2017.

16.     Individual Defendant Thomas B. Tyree, Jr. has served as a director of the Company since April 2017.

17.     Individual Defendant Scott D. Vogel has served as a director of the Company since April 2017.

18.     Individual Defendant Jeffrey E. Wojahn has served as a director of the Company since 2014.

19.     The Individual Defendants referred to in paragraphs 13-18 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Bonanza Creek (the "Class").   Excluded from the Class are

Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

21.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of November 14, 2017, there were approximately 20,453,549 shares of Bonanza Creek common stock outstanding, held by hundreds of individuals and entities scattered throughout the country.  The actual number of public shareholders of Bonanza Creek will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the S-4 in violation of Section 14(a) of the Exchange Act;

iii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the

Proposed Merger based on the materially incomplete and misleading S-4.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.      The Proposed Merger

22.      Bonanza Creek Energy is an exploration and production company focused on the extraction of oil and associated liquids-rich natural gas in the United States. Bonanza Creek's operations are focused in the Wattenberg Field in the DJ Basin of Colorado and the Cotton Valley sands of southern Arkansas. Bonanza Creek's corporate strategy is to increase production in

current assets, while seeking strategic acquisitions in other high return basins across the United

States.[2]

      23.     On November 15, 2017, Bonanza Creek and SandRidge issued a joint press release

announcing the Proposed Merger, which states in pertinent part:

> OKLAHOMA CITY and DENVER, Nov. 15, 2017 /PRNewswire/ -- SandRidge Energy (NYSE: SD) and Bonanza Creek Energy (NYSE: BCEI) jointly announced today that the two companies have entered into a definitive merger agreement under which SandRidge will acquire all of the outstanding shares of common stock of Bonanza Creek in a cash-and-stock transaction valued at $36.00 per share. The consideration consists of $19.20 in cash and $16.80 of SandRidge shares for each Bonanza Creek share, subject to the collar mechanism described below.
>
> James Bennett, SandRidge's CEO, said "This acquisition greatly enhances our existing portfolio by adding a deep inventory of drill-ready locations in the DJ Basin of Colorado and is highly complementary to our existing North Park, Northwest STACK and Mississippian assets. The geological and operational characteristics of Bonanza's Niobrara and Codell locations are analogous to our existing Colorado North Park assets, and we expect to benefit from the expertise of their teams. Overall, we believe this will drive strong risk-adjusted returns in both areas. Likewise, SandRidge will benefit from the greatly increased scale and substantial cost and operational synergies as a result of the transaction. Lastly, the acquisition will be accretive to cash flow per share and will enhance our ability over time to increase cash flow generation of the business."
>
> Jack Vaughn, Bonanza Creek's Chairman of the Board, stated "We are pleased to be able to accomplish this combination with SandRidge. This transaction represents an attractive opportunity for our shareholders to monetize a portion of their holdings through the cash consideration as well as to participate in the continued upside of the combined company. We believe our Niobrara and Codell assets and expertise will provide a strong complement to the SandRidge story and are excited to partner with SandRidge in growing the combined company."
>
> Brian Steck, a Director of Bonanza Creek and Partner of Mangrove Partners, one of Bonanza Creek's largest shareholders, said "Mangrove is happy to support this transaction and believes that Bonanza Creek's high-return inventory in the DJ Basin provides an excellent complement to SandRidge's attractive development opportunities in the NW STACK and North Park Basin. We believe that the sequenced development of these three assets provide an attractive path to create oil-weighted growth for the combined company."

---

[2]     About Bonanza Creek:An independent energy company producing oil and natural gas in the United States, http://www.bonanzacrk.com/about-bonanza/ (last visited Dec. 27, 2017).

24.     The Merger Consideration appears inadequate in light of the Company's recent financial performance and prospects for future growth. For instance, the Company reported **triple-digit gross income growth in 2016.** The Company also continued to report **double-digit gross income growth through the first three quarters of 2017** despite emerging from Chapter 11 bankruptcy in April 2017, which included a pre-packaged restructuring plan. Moreover, the market reacted positively to the Company's restructuring plan as reflected in the Company's post-market high of $39.20. Tellingly, the Merger Consideration represents a ***9% discount*** to that high.

25.     In sum, it appears that Bonanza Creek is well-positioned for financial growth, and that the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the S-4, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Merger.

## II.     The Materially Incomplete and Misleading S-4

26.     On December 11, 2017, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Merger. The S-4 solicits the Company's shareholders to vote in favor of the Proposed Merger. Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

***Financial Forecasts that Violate Regulation G and SEC Rule 14a-9***

27.     The S-4 fails to provide material information concerning the Company's financial forecasts, which were developed by the Company's management and relied upon by the Board in recommending that the shareholders vote in favor of the Proposed Merger. S-4, 114-115. The S-4 also fails to provide material information concerning SandRidge's financial forecasts or the companies' combined forecasts, which were distributed by Bonanza Creek's management to its shareholders in connection with the proposed merger. S-4, 100-103, 115. These financial forecasts were relied upon by the Company's financial advisor, Evercore, in rendering its fairness opinion. S-4, 116.

28.     Specifically, the S-4 provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics such as (1) EBITDA and (2) Levered Cash Flow, but fails to provide: (i) the value of certain line items used to calculate EBITDA or Levered Cash Flow, or (ii) a reconciliation of EBITDA and Levered Cash Flow to their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).

29.     The S-4 defines EBITDA as "earnings before interest, taxes, depreciation and amortization." S-4, 114. However, the S-4 fails to provide the values of taxes nor depreciation and amortization, and fails to reconcile EBITDA to its most comparable GAAP equivalent. S-4, 114.

30.     The S-4 defines Levered Cash Flow as "EBITDA adjusted to reflect the cash flow impact of interest expense, cash taxes and capital expenditures." S-4, 114. However, the S-4 fails to provide the value of cash taxes, and fails to reconcile EBITDA to its most comparable GAAP equivalent. S-4, 114. The failure of the Company to reconcile EBITDA, as explained above, makes it impossible for shareholders to reconcile Levered Cash Flow as well.

31.     When a company discloses non-GAAP financial measures in a registration statement that were relied on by a board of directors to recommend that shareholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all forecasts and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

32.     Indeed, the SEC has increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Bonanza Creek included in the S-4 here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[3]

---

[3]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-*

33.     The SEC has repeatedly emphasized that disclosure of non-GAAP forecasts can be inherently misleading, and has therefore heightened its scrutiny of the use of such forecasts.[4] Indeed, the SEC's Division of Corporation Finance released a new and updated Compliance and Disclosure Interpretation ("C&DIs") on the use of non-GAAP financial measures to clarify the extremely narrow and limited circumstances, known as the business combination exemption, where Regulation G would not apply.[5]

34.     More importantly, the C&DI clarifies when the business combination exemption does not apply:

> There is an exemption from Regulation G and Item 10(e) of Regulation S-K for non-GAAP financial measures disclosed in communications subject to Securities Act Rule 425 and Exchange Act Rules 14a-12 and 14d-2(b)(2); it is also intended to apply to communications subject to Exchange Act Rule 14d-9(a)(2). This exemption does not extend beyond such communications. Consequently, if the same non-GAAP financial measure that was included in a communication filed under one of those rules is also disclosed in a Securities Act registration statement, proxy statement, or tender offer statement, this exemption from Regulation G and Item 10(e) of Regulation S-K would not be available for that non-GAAP financial measure.

*Id.*

35.     Thus, the C&DI makes clear that the so-called "business combination" exemption from the Regulation G non-GAAP to GAAP reconciliation requirement applies solely to the extent that a third-party such as financial banker has utilized projected non-GAAP financial measures to

---

*GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html. (emphasis added)

[4]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[5]     *Non-GAAP Financial Measures*, U.S. Securities and Exchange Commission (Oct. 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm#101. To be sure, there are other situations where Regulation G would not apply but are not applicable here.

render a report or opinion to the Board.  To the extent the Board also examined and relied on internal financial forecasts to recommend a transaction, Regulation G applies.

36.     Because the S-4 explicitly discloses that the Board considered the forecasts of future financial and operational results of the combined company, no exemption from Regulation G is applicable. S-4, 100.

37.     Thus, to bring the S-4 into compliance with Regulation G as well as cure the materially misleading nature of the forecasts under SEC Rule 14a-9 as a result of the omitted information on page 114, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.  At the very least, the Company must disclose the line item forecasts for the financial metrics that were used to calculate the aforementioned non-GAAP measures.  Such forecasts are necessary to make the non-GAAP forecasts included in the S-4 not misleading.

### The Materially Misleading Financial Analyses

38.     Moreover, the financial analyses conducted by the Company's financial advisor, Evercore, in support of its fairness opinion, which the Board relied upon, is materially misleading due to certain omitted information from the S-4.    S-4, 115-119.

39.     Specifically, the S-4 discloses that Evercore conducted a *Net Asset Value Analysis* for both the Company and SandRidge.  S-4, 118-119.  The S-4 further discloses that Evercore utilized "various discount rates depending on the reserve category to the before-tax cash flows" for both the Company and Sandridge, respectively.  S-4, 118, 122.

40.     However, the S-4 omits the range of values of these discount rates, rendering this portion of the S-4 materially false and/or misleading.  Without disclosure of the discount range, shareholders are unable to discern the reasonableness of the rates utilized by Evercore, and are,

consequently, unable to determine the veracity of Evercore's *Net Asset Value* analyses as a whole. Thus, the Company's stockholders are being materially misled regarding the value of the Company.

### Standstill Provisions

41.     The S-4 discloses that, at the direction of the Board, Evercore reached out to 40 potential counterparties to obtain a general level of interest in a possible transaction with the Company. S-4, 82. The Company then entered into confidentiality agreements with 20 potential counterparties that contained "standard standstill provisions" but fails to disclose what those standard provisions are, including whether the standstill provisions included Don't Ask Don't Waive ("DADW") provisions and whether the DADW provisions remain in effect or terminated upon announcement of the Proposed Merger. S-4, 82.DADW standstill provisions are a term in confidentiality agreements that prohibit a potential purchaser from making an offer for the company after the merger agreement is signed, and from asking the target company to waive the standstill provisions so potential purchasers can make a higher offer after the merger agreement is signed. DADW provisions that do not terminate or fall-away once a merger agreement is signed so that other bidders who previously were involved in the sales process can seek to make a superior offer, are generally prohibited. Bonanza Creek shareholders would undoubtedly find it material to know whether any of the 20 counterparties contacted by the Company's financial adviser are contractually prohibited from making a superior offer to purchase the Company. These provisions are material to Bonanza Creek shareholders, and their omission renders the S-4 incomplete and misleading.

42.     Clearly, shareholders would find this information material since the Board's unanimous recommendation that shareholders vote in favor the Proposed Merger was based, in part on the following:

- the Bonanza Creek board's belief that the merger with SandRidge would generate a higher risk-adjusted return to Bonanza Creek stockholders than the other alternatives reasonably available to Bonanza Creek, including remaining a standalone entity, and pursuing other strategic alternatives, including potential transactions with oil and gas companies and private equity firms;
- the financial analysis reviewed and discussed with representatives of Evercore, as well as the oral opinion of Evercore rendered to the Bonanza Creek board on November 13, 2017, which was confirmed by delivery of a written opinion dated November 13, 2017, to the effect that, as of such date and based upon and subject to the assumptions, procedures, factors, qualifications, limitations and other matters stated in their opinion, the merger consideration to be received from SandRidge by the Bonanza Creek stockholders pursuant to the merger agreement was fair, from a financial point of view, to the holders of the shares of Bonanza Creek's common stock issued and outstanding immediately prior to the effective time that are entitled to receive such merger consideration.

S-4, 99-100.

43.     In sum, the S-4 independently violates both (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the S-4 independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the S-4 to garner votes in support of the Proposed Merger from Bonanza Creek shareholders.

44.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the

Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

45.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

46.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

47.     As set forth above, the S-4 omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).

48.     The failure to reconcile the numerous non-GAAP financial measures included in the S-4 violates Regulation G and constitutes a violation of Section 14(a).

## COUNT II

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

49.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

51.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading."  17 C.F.R. § 244.100(b).

52.     Defendants have issued the S-4 with the intention of soliciting shareholder support for the Proposed Merger.  Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things, the financial forecasts for the Company and Sandridge.

53.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were

therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

54. The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.

55. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.

56. The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4. The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial forecasts.

57. Bonanza Creek is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

58. The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

59.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT III**

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

60.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

61.     The Individual Defendants acted as controlling persons of Bonanza Creek within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Bonanza Creek, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

62.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The S-4 at issue contains the unanimous

recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing the S-4.

64.     In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

65.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

66.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

67.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless

and until the Company discloses the material information discussed above which has been omitted from the S-4;

  C.  Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

  D.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

  E.  Granting such other and further relief as this Court may deem just and proper.

**<u>JURY DEMAND</u>**

  Plaintiff demands a trial by jury on all issues so triable.

Dated:  December 27, 2017

|  |  |
|---|---|
| **OF COUNSEL:** | Respectfully submitted, |
| **FARUQI & FARUQI, LLP** | **FARUQI & FARUQI, LLP** |
| Nadeem Faruqi | By:  */s/ Michael Van Gorder* |
| James M. Wilson, Jr. | Michael Van Gorder (#6214) |
| 685 Third Ave., 26th Fl. | 20 Montchanin Road, Suite 145 |
| New York, NY 10017 | Wilmington, DE 19807 |
| Tel.: (212) 983-9330 | Tel.: (302) 482-3182 |
| Email: nfaruqi@faruqilaw.com | Email: mvangorder@faruqilaw.com |
| Email: jwilson@faruqilaw.com | |
| | *Counsel for Plaintiff* |
| *Counsel for Plaintiff* | |